IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| TRANSPORTATION ALLIANCE BANK, INC. dba TAB BANK, | ORDER APPROVING APPOINTMENT OF REALTY RESOLUTION ADVISORS, LLC AS RECEIVER |
| Plaintiff, | |
| vs. | |
| HELPING HANDS HOUSING I, LLC a Delaware limited liability company; and POINT CAPITAL PARTNERS, LLC, a Delaware limited liability company, | Case No. 1:13-cv-00046-RJS Judge Robert J. Shelby |
| Defendants. | |

This matter is before the court on Plaintiff Transportation Alliance Bank, Inc.'s Motion for Immediate Appointment of Receiver and for Hearing on Permanent Appointment (Dkt. No. 7). Based upon the motion, other filings with the court, and good cause appearing therein, it is hereby ordered that a receiver be appointed under the terms detailed in Section II of this Order.

## I. FACTUAL BACKGROUND

This case concerns a series of financing agreements in which the collateral pledged was real property and financial instruments based on that real property. Transportation Alliance Bank, a Utah-based industrial loan corporation, lent money to Helping Hands Housing, LLC, a wholly owned subsidiary of Point Capital Partners, LLC. Point Capital is a Delaware limited liability company that facilitates alternative investments, including in distressed real estate. This investment encompasses distressed residential real assets, distressed mortgage residential loans and distressed or performing real estate installment sale contracts-for-deed.

The contractual relationship between the parties began when Transportation Alliance Bank, Point Capital Partners and Helping Hands entered into a series of agreements after negotiations in late fall and early winter of 2011. It appears that this series of agreements concerned a secured lending facility and advance of funds for the benefit of Helping Hands in exchange for a promissory note pledged to Transportation Alliance Bank in the amount of $10,000,000. The relevant agreement at issue here is the Loan Agreement (*See* Loan Agreement, Dkt. No. 2-2) signed by the parties on November 30, 2011.

The Loan Agreement grants Transportation Alliance Bank a first-priority security interest in the collateral held by Helping Hands, largely consisting of distressed real estate or distressed real estate financial instruments. Helping Hands and Transportation Alliance Bank's agreements concerned two types of portfolios of 3,800 assets: (1) a portfolio of 2,500 performing or semi-performing assets, mostly real estate and installment sales contracts-for deed for real estate, that were directly assigned to Transportation Alliance Bank on December 7, 2011 and (2) a portfolio of approximately 1,300 non-performing assets, mostly non-performing loans and real estate owned (REO) assets, assigned to Transportation Alliance Bank on November 30, 2011.

Helping Hands represents that it understood the agreement between the parties as an agreement to allow Helping Hands, Point Capital, and Halo Companies, Inc.[1] to convert the non-performing assets into performing assets and sell the rest of the non-performing assets. Helping Hands avers that Transportation Alliance Bank's role was to purchase the converted performing assets from Helping Hands and Point Capital in order to draw down the line of credit that

---

[1] Halo is a special servicer company located in Dallas, Texas. Halo currently services over 6,700 assets in total for many clients, including Helping Hands. It focuses on servicing these affordable housing-type assets, including installment sale contracts-for-deed, non-performing loans and REO assets. (Defendants' Opposition to Plaintiff's Emergency Motion, Dkt. No. 19, ¶ 15).

2

Helping Hands has with Transportation Alliance Bank and to potentially also expand that line of credit to $30,000,000. This relationship Helping Hands understood as a "global partnership" with Transportation Alliance Bank, and one that it would not have entered into without the understanding and expectation that Transportation Alliance Bank would also be purchasing the assets from the performing portfolio. Transportation Alliance Bank disputes this characterization of the relationship, citing to the integration clause[2] and the text of the Loan Agreement between the parties as evidence that the relationship was solely an arms-length lending transaction, not a global real estate investment venture.

By December 2011 Helping Hands had drawn down some $8,155,892.39. Thereafter a number of defaults occurred. These initial defaults appear to be largely related to disclosure of financial agreements, failure to maintain balance ratios in the portfolio, and failure to timely make payments. (*See* Complaint, Dkt. No. 2, ¶29(a)-(t)).

On May 17, 2012, Transportation Alliance Bank sent a default letter to Defendants, who responded with approximately 1,000 pages of data. After this letter there were a series of meetings between the parties in an attempt to address various financial concerns. On October 15, 2012, Transportation Alliance Bank sent another default letter to Defendants. Point Capital responded with written letters of its own in November and December of 2012. On December 18, 2012, Transportation Alliance Bank sent a third default letter to Defendants. Just prior to this the parties allegedly expected a forbearance agreement.

---

[2] The integration clause can be found in the Loan Agreement at §9.22. It appears to be a standard integration clause that prohibits any oral agreements or other contracts from superseding the November 30, 2011, Loan Agreement.

The relationship continued to deteriorate. Helping Hands and Point Capital fired or lost personnel in their Portland, Maine office and consolidated the management of these portfolios in their New Jersey office. At the time of Transportation Alliance Bank's emergency motion Defendants submit that they were still working with HALO to actively manage the portfolio, and attempting to sell off numerous assets piecemeal in order to satisfy their obligation to Transportation Alliance Bank. Point Capital avers that it has kept none of the proceeds of these sales, and has strategically made sales in order to reduce the risk, mostly through tax liability, in the portfolio.

Transportation Alliance Bank filed its Complaint (Dkt. No. 2) on March 7, 2013 and immediately moved for the emergency appointment of a receiver (Dkt. No. 7). Transportation Alliance Bank sought appointment of a receiver based on the Loan Agreement between the parties and also as an equitable matter under Federal Rule of Civil Procedure 66. The court held a hearing on the emergency appointment of a receiver on April 5, 2013.

Examining the text of the parties' Loan Agreement, the court determined that defaults had occurred under the Loan Agreement and that under the express terms of Section 7.1(j) of the Loan Agreement Transportation Alliance Bank was entitled to the appointment of the receiver. On April 26, 2013, the court held a further evidentiary hearing to determine the identity of the receiver and the scope of its authority. Having considered the briefing and arguments of the parties at the hearing, the court HEREBY APPOINTS Realty Resolution Advsiors, LLC as receiver under the terms below, EFFECTIVE one week from the entry of this order.

4

## II. APPOINTMENT OF RECEIVER

A. **Identity of the Receiver**

Realty Resolution Advisors, LLC, by and through its principal, Charles H. Dunlap III or other officers ("Receiver"), is hereby immediately appointed as general receiver over the Collateral (defined below), to serve without bond, pursuant to Rule 66 of the Federal Rules of Civil Procedure and historical practice, and on the specific, further terms and conditions of this Order.

B. **Possession of Receiver**

Receiver, as an officer of this court, shall immediately have and take possession, custody, and control of all of Defendant Helping Hands Housing I, LLC's ("Helping Hands") real and personal property, all as more fully described in the Verified Complaint (Dkt. No. 2) and the Loan Agreement attached as Exhibit 2 thereto (the "Loan Agreement"), which defines such real and personal property as the "Collateral," which definition is incorporated by reference as if fully set forth herein. *See* Loan Agreement, Section 8, pp. 51-52. The Collateral is further described in Exhibits A-2 (Non-Performing Notes) and B-2 (Owned Real Property List) of the Loan Agreement. Pursuant to Rule 66 of the Federal Rules of Civil Procedure and 28 U.S.C. § 754, Receiver shall file a copy of this Order and the Verified Complaint (Dkt. No. 2) in the district court in each district in which the Collateral, or any part thereof, is located.

C. **Powers and Authority of the Receiver**

Receiver shall have all powers, duties, and authorities as are provided by law and under the Loan Agreement to take possession of, use, sell, operate, manage, and control the Collateral, to collect and receive any and all proceeds, rents, profits, payments, and other income, to protect, preserve, maintain, and improve the Collateral, and to incur expenses that are necessary and appropriate toward those ends, all subject to further order from this court, or written stipulation of the parties, regarding to whom such Collateral and its proceeds should be transferred.

5

Without limiting the foregoing, the Receiver's powers and duties shall specifically include the right and obligation, as the case may be:

1. To gain access to the Collateral and to take possession and control of the same;

2. To operate, manage, and control the Collateral, including without limitation the power to enter into contracts that the Receiver in its business judgment reasonably believes necessary for the operation and maintenance of the Collateral;

3. To care for, preserve, protect, and maintain the Collateral pending the court's determination or written stipulation of the parties of any issues related to the control of the Collateral or proceeds therefrom;

4. To demand, collect, and receive any rents, payments, income, profits, or proceeds of the Collateral;

5. To present for payment any checks, money orders, or other forms of payment made payable to Helping Hands that constitute rents, payments, income, profits, or proceeds of the Collateral, endorse the same and collect the proceeds thereof, such proceeds to be held, used and maintained as provided in this Order;

6. To seize any and all funds or other assets which constitute rents, income, profits, or proceeds of the Collateral, including seizing any Helping Hands bank accounts, rights to payment from escrow accounts, other cash accounts or cash equivalents, and lock box funds that contain rents, income, profits, or proceeds of the Collateral, including, without limitation, any accounts held by or otherwise located at Point Capital Partners, LLC ("Point Capital"), Orion Financial Group, Inc. ("Orion") or Halo Companies, Inc. ("Halo");

7. To do any and all things necessary and appropriate to ensure timely compliance with ownership and other obligations related to the Collateral, including without limitation any and all environmental, regulatory, easement, lease, and entitlement obligations, and to ensure

that all taxes, assessments, utilities, and insurance obligations are current, all to avoid defaults or penalties and to generally protect the Collateral from defaults or penalties;

8. To open and utilize bank accounts for the acceptance and deposit of monies and funds collected and received in connection with Receiver's administration of the Collateral, at any institution Receiver deems appropriate, provided that any funds on deposit at said financial institution are fully insured by an agency of the United States government;

9. To operate, manage, control, and conduct the Collateral and incur the reasonable expenses necessary in such operation, management, control, and conduct in the ordinary and usual course of business, and do all other things ordinarily done, and, on behalf of Helping Hands for all matters that relate to the Collateral, incur the risks and obligations ordinarily incurred by, owners, managers, and operators of similar property;

10. To hold the monies coming into possession of Receiver pursuant to its possession, operation, management, and control of the Collateral, and not expended for any of the purposes authorized in this Order, subject to such further orders as this court or written stipulation of the parties;

11. Subject to the attached Confidentiality Agreement, to take possession of and/or obtain copies of all books and records, ledgers, financial statements, financial reports, and all other business records (including, but not limited to, information contained on computers and any and all software relating thereto, as well as all bank records, statements, budgets, rent rolls, sales records, personnel records, real estate tax records, construction and other bonds, governmental agency permits, and approvals, and building permits), pertaining to the Collateral, and any income derived therefrom, wherever located, as Receiver deems necessary for the proper administration, management, and/or control of the receivership estate;

12. Receiver shall cause all existing insurance policies to be amended by adding Receiver and the receivership estate (as applicable) as additional insureds on those insurance

policies for the period that Receiver shall be in possession of the Collateral. Receiver shall have authority to procure replacement or additional insurance, including appropriate liability and other insurance coverage on the Collateral, in Receiver's name, on behalf of Helping Hands, named as an additional insured and loss payee under all policies. If Receiver does not have sufficient funds to do so, Receiver shall seek instructions from the court with regard to whether such insurance shall be obtained and how it is to be paid for;

13. To execute and prepare any and all documents and to perform any and all acts that are necessary to fulfilling Receiver's duties, including preserving, protecting, maintaining, operating, managing, and controlling the Collateral;

14. To bring and prosecute all proper actions against persons for the (a) collection of rents, payments, income, profits, or proceeds of the Collateral, (b) protection of the Collateral; (c) damage caused to the Collateral; and (d) recovery of possession of the Collateral or any proceeds of the same;

15. To issue subpoenas for documents and testimony, to the extent necessary, consistent with the Federal Rules of Civil Procedure;

16. To employ servicers, sub-servicers, custodians, property managers, attorneys, accountants, brokers, agents, or other servants deemed by Receiver to be necessary or advisable in Receiver's discretion and judgment to assist Receiver in performing Receiver's duties hereunder and to administer the receivership estate, all as the Receiver shall deem necessary or appropriate, and to pay the reasonable value of said services from the funds of the receivership estate;

17. To evaluate outstanding invoices from Halo and its sub-servicer, LenderLive, and to make recommendations to the court concerning the partial or complete payment of those invoices.

18. To use Helping Hand's tax identification number and any other similar numbers used by Helping Hands with the state, local, and federal taxing authorities for the preservation, protection, maintenance, operation, management, and control of the Collateral;

19. To open the mail of Helping Hands, its agents, servants, employees and representatives, and to direct the U.S. Postal Service to forward all mail addressed to Helping Hands to Receiver's office. Receiver is authorized to make copies of, and to then forward this mail to Helping Hands;

20. To engage a locksmith for the purposes of gaining entry to any property that is the subject of this receivership, and to gain access to any security system, in order to obtain any property or documents to which Receiver is entitled pursuant to this Order, and to give any notices that may be necessary in performing Receiver's duties; and to have locks or security codes changed, or have keys created that will work for the existing locks;

21. Nothing in this Order shall preclude Receiver from hiring professionals, servicers, sub-servicers, or vendors to assist it with the performance of its duties under this Order, so long as the fees charged for such services are usual and customary in the locality where the services are to be provided, and any compensation or repayment for such services is subject to the subsequent review and approval of this court, as provided for herein;

22. To generally do such other things as may be necessary or incidental to the foregoing specific powers, directions and general authorities, provided Receiver obtains prior court approval for any actions beyond the scope contemplated herein; and

23. After expending the reasonable, necessary costs and expenses to marshal, gather, protect, preserve, operate, and liquidate the Collateral, if the Receiver determines liquidation of some or all of the Collateral to be warranted, the Receiver shall maintain any remaining funds for distribution to the party legally entitled to receive such funds as determined by subsequent order of this court.

D. **Further Orders**

Receiver or the parties to this action may, at any time, apply to this court for further orders, including an order to terminate the receivership, or other orders providing further instructions and powers necessary to enable Receiver to perform its duties properly.

E. **Compensation of Receiver; Payment of Costs and Fees; Reporting**

1. The Receiver shall be compensated out of the proceeds of the Collateral, subject to the terms of this Order. The Receiver shall be compensated hourly at the following rates: Principals—$275 per hour; Directors—$225 per hour; Associates—$175 per hour; Senior Staff—$125 per hour; Support Staff—$65 per hour. The maximum daily fee for professional services per individual shall be limited to 10 hours per calendar day. Assignments requiring an overnight stay shall be billed a $200 per diem per individual. Mileage shall be billed in accordance with current IRS published rates and airline costs to be billed at actual cost for economy or coach flights. All copies and other reproduction services provided by vendors to the Receiver shall be billed as a reimbursable expense. All copies and other reproduction services performed by the Receiver in-house shall be billed at $0.10 per page;

2. Receiver may pay vendors, service providers, and other third-parties who have provided goods or services for the benefit of the receivership estate as those amounts come due, subject final approval of such payments as discussed below. Receiver shall be paid on a monthly basis, provided however that all payments shall be subject to subsequent review and approval of the court after notice to the parties in the case. Receiver shall provide a monthly statement reflecting the Receiver's costs and fees to Transportation Alliance Bank and Helping Hands. If the Receiver does not receive a written objection to Receiver's monthly statement of costs and fees from Transportation Alliance Bank and/or Helping Hands within fourteen (14) days, Receiver's costs and fees shall be deemed approved by Transportation Alliance Bank and Helping Hands, and the Receiver shall pay such amounts. Notwithstanding monthly payment of

Receiver's fees and expenses, all fees and expenses shall be submitted to the court for final approval and confirmation, in the form of either a properly noticed quarterly request for approval of fees, stipulation of all parties, or in Receiver's final account and report. The monthly statements are *not* to be filed with the court. Only Receiver's interim and final accounts and reports are to be filed with the court. Service of such monthly reports to the parties may be by electronic mail;

3. All costs and fees owed to or incurred by the Receiver shall have priority over other debts owed by Helping Hands and/or claims against the Collateral;

4. Receiver shall file and serve upon the parties to this action an initial written report of all property constituting the Collateral, based on the Receiver's initial investigation, within thirty days of entry of this Order;

5. Receiver shall file and serve upon the parties to this action monthly written reports reflecting the identity of the Collateral, an accounting of all payments, proceeds, or other income and expenses, and including a summary of fees and administrative costs and expenses of Receiver and the other servicers, sub-servicers, property managers and other professionals employed by Receiver incurred during the reporting period. Upon service of each such report, Receiver may disburse from estate funds, if any, amounts necessary to satisfy obligations incurred; and

6. Receiver shall retain originals and/or legible copies of all writings and other documents which were used or referred to in order to prepare the statements under the foregoing paragraphs of this Order, including, but not limited to, checks, contracts, agreements, and invoices.

F. **Receivership Advances**

1. To the extent the cash assets of the receivership estate are inadequate to pay for the operating expenses of the receivership, including payment of Receiver's reasonable fees and

expenses, Plaintiff may advance such additional and further cash to the receivership estate as may be necessary to cover any such shortfall, but subject to at least fourteen (14) calendar days prior notice to Defendants, and their respective counsel, and the opportunity for the same to object to any such advance. If the Receiver does not receive a written objection to the proposed advance by Plaintiff within fourteen days, the advance shall be deemed approved by Defendants. If approval of Plaintiff's advance requires immediate action, then the Receiver can seek approval from the court so that Receiver may seek such advance prior to the expiration of any fourteen-day notice period. All such advances by Plaintiff to Receiver shall be deemed to be additional advances under the Loan Agreement and shall be evidenced by one or more Receiver Certificates acknowledging receipt by Receiver of such funds. Notwithstanding the foregoing, Plaintiff shall not be obligated to make any such advances, and the decision to make such advances rests solely with Plaintiff;

2. In the event the Receiver requests an advance from Plaintiff, and Plaintiff declines to make such advance, the Receiver may seek advances from other parties or lenders, so long as the Receiver provides written notice of such request to the parties and that parties do not object within three business days of actual receipt of such notice. If such objection is made, the Receiver shall not obtain such advance without approval from the court;

3. To avoid accruing interest expense, Receiver, in its business judgment, may repay any advances made to the receivership, by Plaintiff or some other party or lender, from the assets of the receivership estate as and when funds are available to do so;

4. The repayment of any receivership advances shall be made on a "first-in, first-out" basis, meaning that the earliest advance will be repaid first, with subsequent advances to be repaid in order thereafter; and

5. Receiver may, but shall not be obligated, to make any advances of funds. The decision to make such advances rests solely with Receiver.

G. <u>Receiver May Liquidate</u>

Receiver is hereby granted authority from the court to market and sell the Collateral, in whole or in part, but subject to (a) at least fourteen calendar days prior notice to Transportation Alliance Bank, Helping Hands, and any know creditors or other lienholders claiming an interest in the Collateral to be sold, and their respective counsel, and the opportunity for the same to object to any such proposed sale, (b) a further hearing on any objections that are filed, and (c) a further order from the court approving Receiver's decision to sell the Collateral or any part thereof. Notwithstanding the foregoing, Receiver is not required to liquidate or windup the Collateral without further order from this court unless absolutely necessary to preserve the value of the Collateral or any portion thereof.

H. <u>Non-Interference With Receiver</u>

Defendants, their agents, representatives, and employees, and any other parties with actual or constructive notice of this Order, including, without limitation, Defendants' managers, officers, directors, employees, agents, creditors, shareholders, representatives, attorneys and consultants, and all persons or entities for or acting in concert with them, are enjoined and restrained from:

1. Directly or indirectly interfering with Receiver's management and operation of the Collateral;

2. Directly or indirectly interfering with Receiver's collection of rents, payments, income, profits, or proceeds of the Collateral;

3. Collecting or attempting to collect the rents, income, payments, profits, or proceeds of the Collateral;

4. Extending, dispersing, transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in or disposing of the whole or any part of the Collateral (including the rents thereof) without the prior written consent of Receiver; and

5.  Doing any act which will, or which will tend to, impair, defeat, divert, prevent or prejudice the preservation of the Collateral.

I.  **Turnover**

Defendants, and their managers, employees, representatives, and agents, shall turn over to Receiver all of the following that are in their possession, custody or control:

1.  Possession of the Collateral, including all keys to all locks and the records, books of account, bank accounts, ledgers, certificates, pledges, shares, membership interests, and all business records for Helping Hands (including, without limitation, accounting records, contracts, bank statements, signature cards, and all documents related to the Collateral), wherever located in and whatever mode maintained (including, without limitation, information contained on computers and any and all software relating thereto as well as all banking records, statements, and canceled checks);

2.  All documents which constitute or pertain to all licenses, permits or governmental approvals relating to the Collateral;

3.  All documents which constitute or pertain to insurance policies, whether currently in effect or lapsed which relate to the Collateral;

4.  All contracts, leases, and subleases, royalty agreements, licenses, assignments or other agreements of any kind whatsoever, whether currently in effect or lapsed, which relate to any interest in the Collateral; and

5.  All rents, income, profits, or proceeds of the Collateral (including, without limitation, all escrowed funds, security deposits, advances, prepaid rents, storage fees, and parking fees) wherever and whatsoever mode maintained.

J.  **Liability**

1.  To the fullest extent allowed by law, the Receiver and his officers, agents, attorneys, consultants and employees (the "Receiver Parties"), shall be immune from and shall

be held harmless from and against any and all suits, liabilities, claims, losses, lawsuits, judgments, and/or expenses, including but not limited to attorney fees', costs and monetary damages, arising out of or related to, either directly or indirectly, his, her or their performance of duties or obligations pursuant to the terms of this Order (collectively, "Claims"), unless such Claims arise out of or are related to the recklessness, willful misconduct or gross negligence of the Receiver Parties;

2.   No person or entity shall file suit against the Receiver or his agents or professionals, or take any other action against the Receiver or his agents or professionals, without an order of this Court permitting the suit or action after appropriate notice to parties in interest, *provided, however*, that no prior court order is required to file a motion in this action to enforce the provisions of this Order or any other order of this court in this action;

**K.   Discharge**

1.   Receiver shall relinquish possession and control of the Collateral (a) upon written stipulation of the parties, (b) upon the terms and conditions of this Order regarding the liquidation of the Collateral, (c) upon further order of the court, including without limitation, any order discharging Receiver from its duties under this Order pending approval of Receiver's final account and report to the court. Upon relinquishing possession and control of the Collateral, Receiver shall be discharged from all further duties, liabilities, and responsibilities relating to Helping Hands and the Collateral or such portion thereof; pending approval of the Receiver's final account and report to the court relating thereto;

2.   Not later than thirty days after the receivership terminates, Receiver shall file, serve, and set for hearing its final report and accounting. Notice must be given to all persons of whom Receiver is aware who have potential claims against the receivership estate, including without limitation, the parties, any lenders who have made receivership advances, professionals and other service providers to the Receiver.

L.   **Successors and Assigns**

This Order shall be binding on any successors and assigns of (or successors-in-interest to) Defendants.

M.   **Effective Date of Order**

This order shall be effective one week from the time signed and entered. Thereafter the Receiver may execute the attached Oath of Receiver, and immediately begin discharging the duties and responsibilities herein.

DATED this 26th day of April, 2013, signed at 4:43 P.M., Mountain Time.

BY THE COURT:

*[signature]*

ROBERT J. SHELBY
United States District Judge